UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH

**GREG WALKER**
    Plaintiff

v.                                                                                                                                                                                                    No. 5:06CV-00129-J

**JO ANNE B. BARNHART**
    Commissioner of Social Security
    Defendant

**MAGISTRATE JUDGE'S REPORT
and RECOMMENDATION**

This matter is before the court upon the plaintiff's complaint seeking judicial review of the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g). The plaintiff is represented by Dennis Fentress. The fact and law summaries of the plaintiff and the defendant are at Docket Entry Nos. 9 and 10, respectively. This matter has been referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636.

The final decision of the Commissioner was rendered on May 5, 2003, by administrative law judge (ALJ) Peter Davenport. In support of his decision denying Title II benefits, Judge Davenport entered the following numbered findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant is working as warehouse deliveryman, and has been since the alleged onset date and is earning an average of up to $825.60 per month.

3. The claimant's work activity involves significant physical or mental activity for pay or profit (20 CFR § 404.1572).

4. The claimant's work activity constitutes substantial gainful activity within the meaning of the regulations (20 CFR § 404.1574).

   5.  The claimant has not been unable to engage in substantial gainful activity for any continuous period of at least 12 months.

   6.  The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(b)).

(Administrative Record (AR), p. 19).

**Governing Legal Standards**

   1. The court has jurisdiction to examine the record that was before the Commissioner on the date of the Commissioner's final decision and to enter a judgment affirming, modifying, or reversing that decision.  42 U.S.C. § 405(g), sentence four.  In exercising its "sentence four" jurisdiction, the court is limited to determining whether the Commissioner's controlling findings are supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching her decision.  *Richardson v. Perales*, 402 U.S. 389 (1971).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524 (6th Cir., 1981).  It has been described as a sufficient amount of evidence "to justify, if the trial were to a jury, a refusal to direct a verdict."  *Sias v. Secretary*, 861 F.2d 475, 480 n. 1 (6th Cir., 1988).  In determining whether the Commissioner's findings are supported by substantial evidence, the court must examine the evidence in the record taken as a whole and must take into account whatever in the record fairly detracts

from its weight. *Wyatt v. Secretary*, 974 F.2d 680 (6th Cir., 1992). However:

> The substantial-evidence standard allows considerable latitude to administration decision makers. It presupposes that there is a zone of choice within which the decision makers can go either way, without interferences by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.

*Mullen v. Secretary*, 800 F.2d 535, 545 (6th Cir., 1986).

When conducting substantial evidence review, the court is restricted to a consideration of the evidence that was before the Commissioner on the date of the final decision. When the Appeals Council declines to review the ALJ's decision and render a new decision, the ALJ's decision becomes the Commissioner's final decision. *Cotton v. Secretary*, 2 F.3d 692 (6th Cir., 1993).

2. To be entitled to disability insurance benefits (DIB), a claimant must be under the age of 65 years, must meet the insured status requirements of Title II of the Social Security Act, and must be under a disability as defined by the Act.

3. Disability determination is a five-step sequential evaluation process, to-wit:

**STEP #1** The claimant must not be engaged in substantial gainful activity.

**STEP #2** The alleged disabling impairment must be "severe."

**STEP #3** If the claimant has a medical condition that meets or exceeds the criteria for an impairment defined in Appendix 1 of 20 C.F.R. Part 404, Subpart P of the regulations ("the Listing"), a conclusive presumption attaches that the claimant is disabled.

**STEP #4** The claimant must not be able to perform his past relevant work either as he actually performed it or as it generally performed in the national economy.

**STEP #5** If the claimant makes a prima facie showing that he cannot perform his past relevant work, the burden of going forward with evidence shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can perform. *Born v. Secretary*, 923 F.2d 1168 (6th Cir., 1990).

### Discussion

This case was denied at the first step of the sequential evaluation process based upon a finding that the plaintiff is engaged in substantial gainful activity (SGA). The sole issue is whether this finding is supported by substantial evidence.

The plaintiff's father, Keith Walker, is part-owner of K & K Office Equipment, Inc., which is located in Paducah, Kentucky. K & K is a relatively small business with two co-owners, Mr. Walker, and Ken Johnson, and only one worker, the plaintiff. In March of 2001, Mr. Walker provided the following statement (AR, p. 63):

> Greg has been working for me since 1976. He was diagnosed with diabetes when he was age 4. I have let him work at my business and paid him full salary based on 40 hours per week even though he was actually only working about 20-24 hours per week or less. I currently pay him a salary of $340.00 per week. I do this because he is my son and he has a wife and child to support.

At the administrative hearing in April of 2003, Mr. Walker testified that the plaintiff works an average of 22 hours per week and that he is allowed to leave the work site as needed due to his diabetes (AR, pp. 267-268). In January of 2002, Mr. Johnson provided the following statement (AR, p. 123):

> I am writing this letter at the request of Greg Walker, who has worked for my company, K & K Office Equipment for approximately 20 years. During that time, his health has declined considerably as Greg suffers from juvenile diabetes. Due to our concern for Greg, we have been more than considerate and tolerant of the limitations his health has put on him than one might expect from a typical employer.

> Greg's father, Keith, and I have been business partners since 1973, so you can understand that latitude we have with Greg. We have kept Greg on and paid him his full salary although he seldom, if ever, has worked a full work week. In fact, over the past 10 or so years, his hours have steadily declined, especially over the past year or so.
>
> I would guess that Greg works less than 20 hours a week. We would generally pay someone $8.00 an hour for the type of work that Greg does.
>
> I'd also like to point out that Greg requires an exceptional amount of breaks while he is at work. He often takes time to check his blood sugar level as a health precaution as well, and has suffered from insulin shock on occasion. He often has to leave the work area and go to his father's office to get his blood sugar level under better control.
>
> Again, this letter is to verify that while Greg tries to be as productive as possible his health simply doesn't afford him the ability to work the same type of schedule most of us do each day, week, month, and year. I cannot imagine what it is like to deal with the health problems he faces each day, but I do see very clearly each day the fatigue and overall poor health and its impact on his ability to work. There is no way, from my observations, that Greg could work a regular work week.

In his application for benefits, the plaintiff identified the following "special work conditions" (AR, pp. 90-91):

1. I needed and got special help from other workers in doing my job.

2. I was given special equipment or was given work that was suited to my condition.

3. I was allowed to work at a lower standard of productivity.

4. I worked for a relative or friend.

5. I worked irregular hours or took frequent rest periods.

6. I worked fewer hours.

7. I had different duties; fewer or easier duties.

8. I was paid for extra rest periods at work or extra time off from work and other workers were not.

5

## The Pertinent Legal Standards

The plaintiff's argument is based upon the following regulations that define how the Commissioner is required to evaluate SGA *(emphasis in bold)*:

*404.1573. General information about work activity.*
...
*(c) If your work is done under special conditions.* The work you are doing may be done under special conditions that take into account your impairment.... **If your work is done under special conditions, we may find that it does not show that you have the ability to do substantial gainful activity.** ... However, work done under special conditions may show that you have the necessary skills and ability to work at the substantial gainful activity level. Examples of the special conditions that may relate to your impairment include, but are not limited to, situations in which--

   (1) You required and received special assistance from other employees in performing your work;

   (2) **You were allowed to work irregular hours** or take frequent rest periods;

   (3) You were provided with special equipment or were assigned work especially suited to your impairment;

   (4) You were able to work only because of specially arranged circumstances, for example, other persons helped you prepare for or get to and from your work;

   **(5) You were permitted to work at a lower standard of productivity or efficiency than other employees; or**

   **(6) You were given the opportunity to work despite your impairment because of family relationship**, past association with your employer, or your employer's concern for your welfare.

*404.1574. Evaluation guides if you are an employee.*
...
*(a)(2) We consider only the amounts you earn.* When we decide whether your earnings show that you have done substantial gainful activity, we do not consider any income that is not directly related to your productivity. When your earnings exceed the reasonable value of the work you perform, we consider only that part of your pay which you actually earn. If your earnings are being subsidized, we do not consider the amount of the subsidy when we determine if your earnings show that you have

done substantial gainful activity. **We consider your work to be subsidized if the true value of your work, when compared with the same or similar work done by unimpaired persons, is less than the actual amount of earnings paid to you for your work.** ... We will first determine whether the person received a subsidy; that is, we will determine whether the person was being paid more than the reasonable value of the actual services performed. We will then subtract the value of the subsidy from the person's gross earnings to determine the earnings we will use to determine if he or she has done substantial gainful activity.

*(b) Earnings guidelines – (1) General.* ... **When we review your earnings to determine if you have been performing substantial gainful activity, we will subtract the value of any subsidized earnings (see paragraph (a)(2) of this section)** .... The resulting amount is the amount we use to determine if you have done substantial gainful activity. ....

*(2) Earnings that will ordinarily show that you have engaged in substantial gainful activity.* We will consider that your earnings from your work activity as an employee ... show that you engaged in substantial gainful activity if ... [b]eginning January 1, 2001, and each year thereafter, they average more than [amount(s) determined based upon a mathematical formula].
...
*(3) Earnings that will ordinarily show that you have not engaged in substantial gainful activity.* If your earnings for months beginning January, 2001, are equal to or less than the amount(s) determined [based upon a mathematical formula] for the year(s) in which you work, we will generally consider that the earnings from your work as an employee will show that you have not engaged in substantial gainful activity.

With respect to the earnings guidelines at sections 404.1574(b)(2) and (3), supra, for the year beginning in January of 2001, and thereafter, rather than identifying a specific dollar amount, the regulations identify a mathematical formula that takes into account, among other things, the yearly "national average wage index." In his fact and law summary, the plaintiff alleges and the Commissioner has not disputed that proper application of the mathematical formula results in a conclusion of the following dollar amounts: $740 per month for 2001, $780 per month for 2002, and $800 per month for 2003 (Docket Entry No. 9, p. 11).

**The Plaintiff's Argument**

In this case, the plaintiff does not allege that his gross earnings are insufficient to rise to the level of SGA as contemplated by the earnings guidelines at section 404.1574(b)(2). Rather, his position is that, because the evidence from his father and Mr. Johnson provide uncontradicted evidence that his work is done under "special conditions" as contemplated by sections 404.1573(c)(2), (5), and (6) that relate to his impairment, the work does not necessarily reflect that he has the skills and abilities to do SGA. The evidence indicates that the plaintiff is not engaged in SGA for the following reasons:

1. The plaintiff's gross earnings are about $1,360 per month ($340 per week times 4 weeks).

2. The "true value of [the plaintiff's] work, when compared with the same or similar work done by unimpaired persons" as contemplated by section 404.1574(a)(2) is about $704 per month ($8 dollars per hour times 22 hours per week times 4 weeks per month). See also Social Security Ruling (SSR) 83-33 ("In most instances, the amount of a subsidy can be ascertained by comparing the time, energy, skills, and responsibility involved in the individual's services with the same elements involved in the performance of the same or similar work by unimpaired individuals in the community and estimating the proportionate value of the individual's services according to the prevailing pay scale for such work").

3. $656 of the plaintiff's gross earnings of $1,360 per month are "subsidized earnings" as contemplated by section 404.1574(b)(1) ($1,360 minus $704). See SSR 83-33 (there is a "strong possibility of a subsidy [if] [t]here appears to be a marked discrepancy between the amount of pay and the value of the services").

4. The plaintiff's subsidized earnings must be subtracted from his gross earnings to determine his countable earnings for purposes of application of the earnings guidelines at sections 404.1574(b)(2) and (3).

5. The plaintiff's countable earnings are $704 per month ($1,360 - $656).

6. The plaintiff alleges an onset of disability date of January 1, 2001.

7. For months beginning and after January of 2001, the guidelines at section 404.1574(b)(3) require at least $740 per month of countable earnings to rise to the level of SGA.

8. The plaintiff's countable earnings of $704 per month are presumptively not SGA.

The magistrate judge concludes that the plaintiff's argument is persuasive.

## SSR 83-33 and the Need for Services

SSR 83-33 recapitulates the regulatory standards discussed above. In addition, the Ruling identifies various factors that are pertinent to a determination of whether subsidized earnings are present and, if so, the amount of such earnings. One factor is the relationship of pay to services, which we have already discussed. Among the relevant inquiries are the following:

Relationship of pay to services.

o How are the individual's total earnings computed?
o Is the individual's pay reduced proportionately when he or she is absent from work? (Compare the employer's practice concerning the impaired individual to that which applies to unimpaired workers, explaining any difference.)
o Does the individual receive any unusual assistance or supervision? (Describe.)
o If the individual's pay is not set according to normal business practices, what consideration is given to the size of the individual's family, number of years of past service with the employer, previous earnings, friendship or relationship to the employer, or other factors unrelated to the performance of the work?
o Does the employer consider the individual's work to be worth substantially less than the amount paid and, if so, what are the employer's reasons for this view? (Give the employer's estimate of the value of the services and explain how this estimate was reached.)

o If the individual is still on the payroll, despite unsatisfactory work, what is the employer's reason for retaining him or her?
o If the individual is no longer employed, what led to the termination of employment?

The Ruling further provides that another factor in determining whether subsidized earnings are present is the employer's need for the employee's services, to-wit:

Need for services. (Omit if employer is a sheltered workshop.)

o Why was the individual hired?
o What are the individual's job duties?
o How much time does the individual spend on those duties?
o Who did the job before the individual was hired; and how much time did that person spend on the duties of the job?
o If the individual were separated from the job, would he or she be replaced; if so, how much time would the replacement spend on the individual's duties?
o How often is the individual absent from work?
o Does someone else do the individual's work when he or she is absent?
o How much time does the temporary replacement take to do the individual's job?

In this case, there is no evidence that the plaintiff would be replaced if he were separated from his job. On the contrary, Mr. Walker testified that, when the plaintiff is unable to be at work and "on things that [the plaintiff] is not capable of handling, I do it" (AR, p. 235). In light of the foregoing factors, the plaintiff's continued employment appears to be based, to a significant extent, upon matters other than a need for the plaintiff's services. We have already concluded that the relationship of pay to services in this case is indicative of subsidized earnings. Therefore, both factors militate a conclusion that subsidized earnings are present.

### Case Law Support for the Plaintiff's Position

There is precedent in support of the plaintiff's underlying proposition that subsidized earnings may be present in cases in which individuals who work in family businesses are accorded unusual flexibility due to their impairments. The facts of the present case are similar to those

presented in *McCormick v. Barnhart*, 2004 WL 769386 (N.D.Cal.). McCormick worked as manager of a fast food restaurant owned by his parents. McCormick's mother provided the following statement:

> We made allowances for Richard because he was our son, and we would not have put up with anyone else with his attitude. ... If he had not been our son, we would never have kept him on as an employee. Eventually, though he was our son, we asked him to leave because the other night shift employees were very unhappy and were threatening to quit if Richard returned. We also had some complaints from customers about his attitude.

The court acknowledged the following legal standards, which we have concluded apply herein:

> The Social Security regulations provide that an applicant's work will not be considered to be "substantial gainful activity" if the work is performed "under special conditions" that "take into account [the applicant's] impairment." See 20 C.F.R. §§ 404.1573(c), 416.973(c). Examples of such "special conditions" include the applicant's being permitted to work "at a lower standard of productivity because of family relationship" and being "given the opportunity to work despite [the applicant's] impairment because of family relationship." See 20 C.F.R. §§ 404.1573(c)(5-6), 416.973(c)(5-6)

However, the court concluded that the foregoing standards were inapplicable to the case before it because "nothing in the record suggests that those 'special conditions' of his employment were because of his severe impairments." McCormick simply misbehaved due to a "bad attitude." In the present case, in contrast, there is no suggestion that the plaintiff's need for extreme job flexibility is due to any factor other than his medical condition. Similarly, in *Sarchese v. Barnhart*, 2002 WL 1732802 (E.D.N.Y.), the court noted the possibility that, due to the relaxation of the rules associated with her work after her stroke, "Sarchese's earnings were, in effect, subsidized as part of the family business [in that] she would have earned less doing the same work for another business. If her actual earnings, minus any subsidy, were less than $500/month, the regulations create a presumption that she did not engage in substantial gainful activity."

11

**Procedural History and ALJ's Decision**

In March of 2002, ALJ Raymond Gliva issued a first-step denial decision (AR, pp. 156-159). In July of 2002, the Appeals Council remanded the matter for further evaluation in light of the evidence that the plaintiff receives "special consideration," i.e., the same evidence of extreme tolerance for absenteeism, etc., discussed above (AR, p. 164). Specifically, the Appeals Council ordered a remand for the following purposes (AR, p. 165):

> Accordingly, the Administrative Law Judge will, to the extent possible, ascertain the value of the subsidy the claimant receives by comparing the time, energy, skills and responsibility in the claimant's work with the same elements involved in the performance of the same or similar work by unimpaired individuals in the community and by estimating the proportionate value of the claimant's services according to the prevailing pay scale for such work.

Upon remand, Judge Davenport issued the Commissioner's final decision herein. Judge Davenport found that there was no subsidy for the following reasons (AR, pp. 17-18):

1. The evidence does not reflect that the plaintiff can "pick and choose" his hours as alleged because the "claimant was unable to reschedule a 1 PM hearing with Judge Gliva to earlier in the day after checking with his employer/father."

2. If the plaintiff can simply "pick and choose" his hours, "the undersigned is left to ponder how does business get done."

3. There is no evidence that the plaintiff works an extremely flexible schedule as alleged. "K and K has not offered any time cards or other corroborating records to substantiate actual hours worked. Rather the company 'would guess (emphasis added)' at the hours worked." Here, the ALJ is referring to Mr. Johnson's statement that "I would guess that Greg works less than 20 hours a week" (AR, p. 123).

12

4.  The ALJ cites *Burke v. Secretary*, 680 F.2d 1128 (6th Cir., 1982), for the proposition that, because K and K claimed the plaintiff's salary as a legitimate business expense for federal income tax purposes, "K and K is now estopped" from claiming that part of the salary was subsidized earnings.

The magistrate judge concludes the ALJ's cited bases for finding no subsidized earnings are unpersuasive for the following reasons:

1.  Because the plaintiff's father also was scheduled to testify at the hearing, the ALJ's assumption that the plaintiff's own schedule was the reason for his inability to accommodate a last-minute rescheduling of the hearing lacks record support.

2.  Mr. Walker testified that, when the plaintiff is unable to be at work and "on things that [the plaintiff] is not capable of handling, I do it" (AR, p. 235). In light of this testimony, there was no mystery to ponder with respect to how business gets done.

3.  Mr. Walker testified that the plaintiff works an average of 22 hours per week (AR, p. 267). While this may not have been a scientifically precise and verifiable estimate, it is the best available evidence. Furthermore, Mr. Johnson's "guess" that the plaintiff worked 20 hours a week was an educated guess that was consistent with Mr. Walker's estimate of 22 hours. In any event, we have utilized the less plaintiff-favorable estimate of 22 hours herein.

4.  *Burke v. Secretary*, 680 F.2d 1128 (6th Cir., 1982), held that Burke, who was denied benefits because she failed to establish a sufficient number of quarters of self-employment to qualify for insured status under the Social Security Act, could not introduce a 1972 amended tax return reflecting her self-employment income for 1958-1960 in her name in an attempt to avoid a conclusive presumption accorded records of the Secretary of Health and Human Services after

13

expiration of time limitations period. *Burke* does not support the ALJ's conclusion that, because K and K claimed the plaintiff's salary as a legitimate business expense for federal income tax purposes, "K and K is now estopped" from claiming that a portion of that salary was subsidized earnings as contemplated by 20 C.F.R. § 404.1574(b)(1). Furthermore, it is not apparent how an estoppel that operates against K and K as a business entity should have any bearing upon the evaluation of the plaintiff's disability claim. Perhaps more fundamentally, it seems inappropriate for an ALJ to deny a Social Security disability claim based upon an interpretation of federal income tax law. The plaintiff argues that a "conclusion that a business can only take as a business expense the actual worth of the services provided by its employees would revolutionize our tax system" (Docket Entry No. 9, p. 14).

## The Commissioner's Position

In her fact and law summary, the Commissioner repeatedly observes that the plaintiff does not work in a "sheltered" setting; and when he is actually doing his work, he requires no unusual assistance or supervision (Docket Entry No. 10, pp. 5 and 7). Although these factors do indicate the presence of a certain type of subsidized earnings, which is not present in this case, it is not the only type of subsidized earnings.

The Commissioner also argues that the plaintiff's "enviable job flexibility ... is inherent to family dynamics ... and also inherent in a salaried position" and, in fact, is "normally associated with" such employment (pp. 7 and 9). The magistrate judge concludes that the plaintiff's job flexibility is not "inherent" because it is not the case that unimpaired individuals who are on salary and/or work at a family business "normally" are free to come and go as they please, which is effectively what the plaintiff does. The plaintiff's job flexibility is due to necessity related to the

plaintiff's medical impairment coupled with a decision by his employers to retain him, despite excessive absenteeism, for personal and family reasons. This qualifies as a type of subsidized earnings.

## Completion of the Sequential Evaluation Process

The plaintiff argues that, in the event the court concludes that the ALJ's first-step denial is not supported by substantial evidence, the court should complete the sequential evaluation process de novo and conclude that the evidence of record adequately establishes that he is disabled. The magistrate judge concludes that it would be inappropriate and beyond this court's scope of review as codified at 42 U.S.C. § 405(g) for this court to do as the plaintiff suggests. The Commissioner's role is to make case-dispositive findings in the first instance, and this court's role is to a review those findings to determine whether they are supported by substantial evidence and in accord with applicable legal standards.

## RECOMMENDATION

The magistrate judge RECOMMENDS that this matter be REMANDED to the Commissioner for a new decision, for advancement of the sequential evaluation process beyond the first step, and for any further proceedings deemed necessary and appropriate by the Commissioner.

**NOTICE**

Pursuant to 28 U.S.C. § 636(b)(1), any party shall have a period of ten (10) days, excluding intervening Saturdays, Sundays, and/or legal holidays pursuant to Fed.R.Civ.P. 6(a), from the date of notice of electronic filing within which to file written objections to the foregoing report with the Clerk of the Court. Further and pursuant to Fed.R.Civ.P. 72(b), any party may file a response to objections filed by another party within ten (10) days, excluding Saturdays, Sundays, and/or intervening legal holidays, after being served with a copy of said objections. A period of three days shall be added to each ten (10) day period above pursuant to Fed.R.Civ.P. 6(e).

The court shall not conduct a <u>de novo</u> review of objections that are general, conclusory, or merely adopt previous pleadings. A copy of any objections and response thereto shall be served on the undersigned at Suite 330, 501 Broadway, Paducah, Kentucky, 42001 or via e-mail to w_david_king@kywd.uscourts.gov. Failure of a party to file timely objections shall constitute a waiver of the right to appeal by that party. *Thomas v. Arn*, 474 U.S. 140 (1985).